Good morning, Your Honor. Tony Farmani on behalf of Mr. Caro. Your Honor, due process protects an accused against admission of eyewitness testimony that was derived from impermissibly suggestive line-ups and is otherwise unreliable. Both are true here. There is absolutely no question what the officers did here, the manner in which they conducted the line-up was simply flawed and in violation of the due process. We know this because we know Salamanca, the 16-year-old who made the identification of my client, Mr. Caro, says that the police officers did not give him a choice. They told him that the people we have apprehended are in fact the ones who attacked. This is the gentleman who threw the bike at the car. And we know this, we know because he also says that he never made any of these identifications until he was directly told by the officer in the car, Officer Cuso, that they're in fact the ones who committed this crime. Now, even before that, Your Honor, my client, Mr. Ramirez, his co-defendants, Mr. Calderon, were simply hanging out in an area that is frequented by gang members. The gang members who were involved admittedly in the attack. There was no description whatsoever that matched my client. There was a description about a blue That's not the end of the inquiry, right? It is not, Your Honor. Then you look to see if, in fact, it is reliable, aside from the line-up being suggestive. But the corrupting effect of that line-up was so severe, Your Honor, that they translated into a misidentification. How do we review that determination? Pardon me, Your Honor? How do we review that determination? The standard review, if you're asking, Your Honor, whether or not there would be under any standard review, Your Honor, whether you review it under AEDPA standards, under de novo, you know, this was a merits determination by the California Supreme Court in a one-line order, assuming it refers back... There was a Superior Court order, too. Yeah, there was a Superior Court order that the line-up did not appear to be suggestive or did not appear to be flawed. I mean, that's all we have. I mean, this is a factually intensive case. There was lots of briefing done in this case. There were officers who had been out only three years out on the force, a bike-duty officer, a patrol officer. There was no determination by the state courts of what happens if the line-up is suggestive. Nothing at all, Your Honor. The only thing we have is a Superior Court order which is just as good as a one-line order from the California Supreme Court. Now, you do have the middle part, the California Court of Appeal, suggesting that, you know, the claim is procedurally barred. The state has never argued it, but even if the state... I mean, it's just never been argued, whether or not... I mean, I looked at those cases that the Court of Appeal cited that absolutely are irrelevant to the circumstances of this case, Your Honor. So what you're left with is just a one-line from the California Superior Court judge saying that, hey, the line-up appeared to be done correctly, and that's just absolutely false, Your Honor. There's no two ways about it. That is absolutely false. Whoever would look at this case and would look at the true facts of this case comes to the same exact conclusion. My client was misidentified. He was apprehended simply because he happened to be in an area that was frequented by members of his gang. There was nothing connecting Mr. Carter to the crime, nothing whatsoever. There was one fact, one description that was given by the radio, which was beige pants and a blue sweater. My client, according to the police report and the preliminary hearing testimony of Officer Cusa, was wearing a blue sweater, which there's nothing remarkable about wearing a blue sweater in November, of course, late hours of November, and he was wearing black pants, period. There's nothing else. He's not wearing beige pants. There's nothing else connecting my client to this crime other than the identification testimony, which is inherently unreliable, Your Honor. Inherently unreliable, and more so in this particular case that I've looked at and the government has cited. None of the cases that are cited by the government, Your Honor, presents similar facts to this case. None. In all those cases, the witnesses had plenty of time to observe the criminal. Plenty of time. Either they were in the same car with one another or there was a bank robbery and the person was chasing the bank and the tellers were actually watching this person going back and forth in the car. Ten young Hispanic males standing in the corner. Who knows who attacked the car? Who did what in the span of two minutes? The driver of the car told the officer in the span of two seconds. We're talking about something that's just simply nonexistent, Your Honor. Well, they were – I think you've overstated your case just a little bit. They gave the officers a description. They were able to come up with clothing descriptions. They gave them a height and weight description. They gave them an approximate age description. They gave an accurate description of a bicycle. So there were other things that the officers had because the officers didn't just choose three people randomly off the street and bring the kids over. Well, they did give a description of 5'5 to 5'7 or 5'4 to 5'6 depending on which one you go by. And then they gave a description of a blue sweater and beige pants and gave a description of male Hispanics in their early 20s or teens. That could be anybody that was at that corner, Your Honor. That could have been anyone. That's the problem with this case. Now, true – Was everybody wearing a blue sweater? Well, according to Mr. Trinidad, one of the eyewitnesses, it was Mr. Ramirez, not my client, that was wearing a blue sweater. My client admittedly was wearing a blue sweater. But what is remarkable about wearing a blue sweater, Your Honor? When the witness is saying that he's positive the person he identified was Mr. Ramirez wearing a blue sweater, when we all know, at least according to the police report, he may very well have been, but the police report says he wasn't. How could that be any – how could that be reliable evidence to rest the conviction on a 26-year-plus sentence for a 25-year-old man at age – in 2000? He's been in prison for 15 years, Your Honor, based on that testimony. And it's just – it's just – to me, I think – and under – I admit, Your Honor, that I may have overstated my case, but I still believe that nevertheless, this is one of these cases where there's miscarriage of justice has happened. And the reason for that is very simple, Your Honor. There's nothing connecting my client to the crime, nothing whatsoever. And, in fact, there's an uncertified issue. Mr. Trinidad, the person who made an identification supposedly, he had told an eye-biased witness that he was going to pick these people out because he doesn't like Florenzo 13 gang members. Never admitted them to evidence because the trial court made an error saying that this was inadmissible here, but it wasn't. The court of appeal said it wasn't, but under the probable standard, not the constitutional standard, said that it was harmless. Unless the court has any questions, I would like to reserve the remainder of my time for the rebuttal, Your Honor. Thank you. Okay. We'll hear from the government. Good morning, Your Honors. Deputy Attorney General Susan Kim for Respondent. In this case, there was strong evidence to convict Petitioner. There were two witnesses, specifically Mr. Trinidad and Mr. Salamanca. Excuse me. I'm sorry. I have difficulty hearing you. Oh, of course. I'll get closer to the mic. I apologize. I also have a very soft voice. Mr. Trinidad and Mr. Salamanca both identified Petitioner at the show-up identification, which occurred shortly after the instant crimes, and they both also identified Petitioner at trial. I do want to respond. But these were not independent identifications, right? They were in the same car. They were in each other's ears. Yes, that is correct, Your Honor. It is true that the three witnesses, Uriarte, Salamanca, and Trinidad, were all in the back seat of the police car. And it's not like they picked them up out of a lineup of other people. They said they are the guys. Well, there were not other people in addition to the three individuals in the show-up. However, there were. There may be a policeman. Yes, there were some law enforcement. So it's a good thing they didn't pick the policeman, huh? Yes, that is a good thing, Your Honor. But I do want to clarify. In response to some of the questions Your Honor had earlier to defense counsel, he does emphasize the testimony of Mr. Salamanca, who did initially testify at trial that a police officer, and I'm assuming he's referring to Officer Cuso. Officer Cuso was the officer who was inside the patrol car during the show-up identification, that a police officer somehow said to him, these are the guys, or said something that would force Mr. Salamanca to make these identifications. Mr. Salamanca identified all three suspects at the show-up identification. However, I do want to point out, reading the entirety of Mr. Salamanca's trial testimony, he did later testify when the prosecutor asked him, did you identify these suspects, referring to the three at the show-up, because somebody told you to. And he specifically testified no. And that's at the excerpts of record at page 1011. So I do want to point that out. Even though the defense does emphasize Mr. Salamanca's testimony, his entire testimony should be considered in that regard. And in response to another question Your Honor had asked regarding what, which as far as the standard of review, the position that we have is that it should be under the AEDPA, and it should be in this case under the mayor's decision from the Los Angeles County Superior Court, which did have a decision which specifically said that it appears that the show-up procedure in this case was done properly by the police. Let's say we disagree with that. I'm sorry, Your Honor? Let's say we disagree with the, we think that's an unreasonable application of the law. Let's say we think the lineup was not fair. Okay. What about the next question of whether the evidence is nevertheless suppressed? Was that addressed by the state court? Well, the Superior Court did not specifically have more reasons other than what it did state in its decision. However, in this case, under Supreme Court precedent, assuming first, the first part is whether the show-up procedure was impermissibly suggestive. And if assuming it is found to be impermissibly suggestive, then the next step is, as you had mentioned, the totality of the circumstances test, which the Supreme Court has identified five factors, including the various factors that are relevant to this case. So turning to this case, several of the factors the district court found, did discuss, and found from- Your Honor, you skipped over the standard of review. Oh, I'm sorry? How do we review that? How do we make that decision? We don't have a state court ruling on that issue. So do we do that de novo? Well, if this court disagrees that the state court decision is not given the deference for AEDPA, although that is our position- Well, the state court ruled on the suggestiveness of the lineup. Yes, that is correct, Your Honor. And decided on that ground. And I'm positive. Let's say we disagree with that. We find that to be an unreasonable application of Supreme Court precedent. Okay. Then there is still a step that has to be taken, and that is to determine whether or not the evidence should be suppressed nevertheless. How do we review that? Is that de novo? Any deference to the state court on this? Do we own any deference to the district court on this? I still believe that the deference is allowed to the superior court decision in this case. And under that standard review and using the Supreme Court factors that were identified, that the show-up identifications of Trinidad and Salamanca were still reliable- I was really not asking for your personal belief. I was actually asking for authority. I'm sorry, Your Honor? You have a- You know, I was asking for some authority on that point, not your personal belief. Okay. We get to an issue that the state court has not decided because it decides a prior issue. Do we owe deference in that circumstance? Do we review de novo? I believe that-well, I would refer to Johnson v. Williams, and I don't have the cite with me, but I could-  It is in the brief. The case is cited, but not for that specific issue we're discussing right now. But in that case, I recall that the Supreme Court said that if a state court makes a decision, but it does not-like that decision is assumed to also address the federal constitutional issues unless it's rebutted. So in this case, if the Superior Court did specifically decide the impermissibly suggestive part of the analysis, I- It thought the line-up was fine. I'm sorry, Your Honor? The Superior Court thought the line-up was fine. It did. Do we sort of assume that it then implicitly made a balancing to which we owe deference? Well, since it is an entire-it is a connected analysis, my answer to that is yes, Your Honor. And I understand if you would disagree, but that is my response. And- How would that work? I mean, the premise for this analysis is missing in the Superior Court's decision. The analysis only goes forward if you have an impermissible line-up. Well, once the Superior Court says it's a permissible line-up, can we even implicitly infer that it engaged in that analysis, and therefore you owe deference? I believe so, because there is also case law which speaks about how even if a state court does not specifically cite federal laws, specifically U.S. Supreme Court precedent, it is still-that is still not-that's not required. So in this case, I believe that it can be inferred that it was the entire analysis, not just the-limited to the impermissible suggestiveness part of that analysis. Okay. Okay. Thank you, Your Honor. And moving on as far as the actual analysis, even if this Court were to disagree with that, then there were several factors in this case that do show that these show-up identifications were reliable under the totality of circumstances. For instance, the opportunity of both Trinidad and Salamanca to view the criminals, the people who were attacking the car, at a very close distance. They were hitting the car, attacking the people in the car from about 6 inches. Salamanca testified it was about 6 inches because they were inside the car and the attackers were at the car windows. And Trinidad testified that although it was a short period of time, perhaps 10 seconds around that time, it was a very close distance. The other factor is the degree of attention during the crime. Both Salamanca and Trinidad paid a great deal of attention during the car attack. Salamanca testified specifically at trial that he was paying great attention, and Trinidad testified that he also was paying attention because his necklace was actually grabbed during the attack and part of it was taken. So he testified to the effect, why wouldn't I remember somebody- Didn't he get along as to who took it? He did. Didn't he change- That is correct, Your Honor. At trial, he identified co-defendant Ramirez as the person who took his necklace. During the show-up identification, he testified it was Louis C. who took his necklace. However, at trial, he extensively explained and continued to explain that his memory was very fresh at the time of the show-up identification, that it was only- The evidence shows that it was only half an hour after the crime itself. So he did explain a couple things. He said, well, it was much- My memory was much better, much fresher, more details at the time of the show-up identification. The crime occurred on November 5, 2000. The trial happened in March- around March 2001. So several months had passed from the time of the crime to the actual trial when he was testifying. And also, specific to Trinidad, there was also some inconsistencies, which he explained that this was a case that involved gang members, and he did- Trinidad, excuse me, specifically identified Petitioner and Louis C. as the two individuals. But at the preliminary hearing, he did not identify Petitioner. And this is something the defense did emphasize to the jury during the trial. And then during the trial, when Trinidad first testified, he initially did not identify Petitioner, was reluctant to identify Petitioner. But then as his testimony continued, he ultimately did identify Petitioner. And the prosecutor asked him, well, why didn't you identify him in the earlier part of the court day? And he explained, you know, I'm afraid. They know where I live. And that is something that he used to explain his hesitancy to identify Petitioner, both at the trial and at the preliminary hearing. And that is something the jury took into account when assessing his credibility and assessing his identifications, both at trial and his prior identifications. So I do see that my time is up, but almost up. But I do want to emphasize- No, it's completely up. It is completely-oh, I apologize, Your Honor. Well, thank you very much. Thank you. I think you're out of time, but we'll give you a minute for rebuttal. Pardon me, Your Honor? He has reserved time. Did you have reserved time? Yes, Your Honor. If I may, just a couple of quick points, Your Honor. One is Salamanca, did you recognize their faces before anyone said anything to you? No. Very clear. Although he later testified that he recognized the suspects based on what they did and their face and their clothes, he again made it clear that the reason why he made the identification, quote, is because the police had already told them they're the three guys. That's Salamanca. With respect to the standard review, Your Honor, there's two ways you can get to de novo review here, Your Honor. One is, as you have pointed out, this is a case that's more aligned like Wiggins v. Smith where the state court simply fails to adjudicate the prong of the claim. Secondly, Your Honor, if you go to the- So you think we review de novo? I believe you could get there in two separate ways, Your Honor, absolutely. I think the first way you can get there is if you go to the Superior Court's decision, that would be Wiggins v. Smith scenario. As the Supreme Court has made clear, if the state court does not adjudicate a prong of a claim, for instance, in a Strickling type of claim where there's two prongs, that's a Superior Court decision. Assuming you go to the Cal Supreme Court decision, you do the look-through and you go to the California Court of Appeal, clearly the respondent has said that the California Court of Appeal denied this claim on procedural grounds, which by definition means that they didn't adjudicate the claim on the merits. And therefore, you adjudicate a claim de novo. So either way, you come to the same conclusion, Your Honor, depending on which one you choose to go by. You still come to the same conclusion. Even if you apply it by deference here, Your Honor, there cannot be a fair amount of disagreement about the result here, Your Honor. There simply cannot be. When a police officer sits you in a car and tells you these are the guys, does not give you a choice, these are the guys who committed this crime. When they're sitting right next to one another, Your Honor is aware of the facts. When they're handcuffed, when the police officers are all around them, nighttime and these people are scared and nervous, they've been in an attack, just, you know, half an hour earlier, obviously they're going to go ahead and pick out these guys. I would have picked them out if I were in the same situation, Your Honor. And that's what happened in this case. That's precisely what happened in this case. Mr. Carro is not necessarily the best citizen out there, but he should not have been convicted of this crime. And that's what due process does. It protects people like Mr. Carro, Your Honor. Unless the Court has any questions. I have 56 seconds. I've gone over my time, Your Honor. Okay. Thank you. Thank you, Your Honor. Case resolved. You will stand for a minute.
judges: Kozinski, O'scannlain, Bybee